# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 03-1815 & 03-3836

GHEBREGZIABHER GHEBREMEDHIN,

*Petitioner*,

v.

JOHN ASHCROFT, ATTORNEY GENERAL
OF THE UNITED STATES,

*Respondent.*

———————

On Petitions for Review of an Order
of the Board of Immigration Appeals
No. A76-841-841

———————

ARGUED JUNE 7, 2004—DECIDED OCTOBER 13, 2004

———————

Before POSNER, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Ghebregziabher Ghebremedhin is a native and citizen of Eritrea, a country formed from a region of Ethiopia that became independent following a national referendum in 1993. Ghebremedhin entered the United States on a six-month tourist visa in 1997 but overstayed; the former Immigration and Naturalization Service began removal proceedings against him in 1998. Ghebremedhin conceded that he was subject to deportation but sought asylum or withholding of removal based on religious persecution. An immigration judge (IJ) concluded

that Ghebremedhin had not established past persecution or a well-founded fear of future persecution and denied asylum, and the Board of Immigration Appeals (BIA) affirmed without opinion. The BIA later denied Ghebremedhin's petition to reopen that decision. Ghebremedhin has petitioned for review of both the BIA decisions. Because we conclude that the evidence Ghebremedhin presented to the IJ compelled the conclusion that he would be subject to persecution should he be forced to return to Eritrea, we grant the petition for review and reverse the decision of the BIA.

According to Ghebremedhin's petition for asylum, he fears returning to Eritrea because the government there is currently persecuting members of his church, the Jehovah's Witnesses. Jehovah's Witnesses have been denied government jobs, housing assistance, and business licenses because they refuse on religious grounds to vote or participate in national service. Ghebremedhin alleged that another Jehovah's Witness he knew, a colleague from the University of Asmara, was jailed and beaten to death for failing to perform national service, and that he personally was denied a business license and a renewal of his passport.

At the hearing on the merits of Ghebremedhin's asylum application, he testified that he had been a Jehovah's Witness since 1984. He stated that Jehovah's Witnesses cannot participate in national service (which in Eritrea generally involves military service), because they "don't intend to kill anybody because we have to love each other." Similarly, Jehovah's Witnesses do not vote because "governments . . . are human and imperfect [and] would not last long." When Ghebremedhin first became a Jehovah's Witness, Eritrea had not yet gained independence from Ethiopia, and the practice of the religion was officially banned by the Ethiopian government. Ghebremedhin worried at the time that if he identified himself as a Jehovah's Witness he would be jailed. According to Ghebremedhin, after Eritrea later became an independent state, the new government viewed

Jehovah's Witnesses as unpatriotic and targeted them for certain disadvantages because they had not voted in the national referendum that led to independence. Ghebremedhin testified that Jehovah's Witnesses were denied business licenses, civil service positions, and travel documents because they refused to participate in national service. On some occasions, he stated, Jehovah's Witnesses were jailed and beaten.

In his testimony, Ghebremedhin highlighted several occasions on which he personally suffered at the hands of the Eritrean government. In the summer of 1996, said Ghebremedhin, he returned to Eritrea from studies in the Netherlands to discover that the university where he taught had been taken over by the government and was requiring all of the faculty to perform national service. Because Ghebremedhin refused to serve on religious grounds, he was unable to resume his employment at the university. That same summer Ghebremedhin applied to the Eritrean government for a business license, but received a letter rejecting the application:

> You have applied for a business license to open a consulting service[ ] . . . [concerning] land irrigation in Asmara. We have reviewed your application and found out that you are a followe[r] of . . . [the] Jehovah['s] [W]itnesses and have not registered or participated [in] the national service. We are obligated to follow the guidelines given to us by the government and have denied your application for the above reasons.

Later, Ghebremedhin continued, one of his colleagues at the university was jailed and beaten until he died of a head wound for refusing to participate in national service on account of his beliefs as a Jehovah's Witness. Shortly after receiving news of this incident in 1997, Ghebremedhin managed to travel to the United States on a passport and visa his university had obtained on his behalf during his

employment there. After arriving in the United States, how-
ever, Ghebremedhin's application to renew his passport was
denied by officials at the Eritrean embassy, who told him that
he was no longer considered a citizen because he had not
completed national service. Finally, Ghebremedhin stated
that the Eritrean government arrested his brother in 1998
for refusing to engage in national service. After a number
of severe beatings in jail, Ghebremedhin's brother was
taken to a hospital where he eventually died.

Ghebremedhin submitted a copy of the State Department's
COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES FOR 1997
as evidence that Jehovah's Witnesses face persecution in
Eritrea. The country report documents that Jehovah's
Witnesses, because of their refusal to vote or participate in
national service, have been subjected to "widespread criti-
cism that the members were collectively shirking their civic
duty." According to the State Department, the government
of Eritrea has dismissed all Jehovah's Witnesses from civil
service positions, revoked their trading licenses, and refused
to issue them passports and identification cards. The country
report cites "economic, employment, and travel difficulties
for Jehovah's Witnesses," and notes that the government
has begun surveying employers to gather information about
any personnel who are members of the church. Finally, the
country report notes that, although national service is a
requirement for all citizens of Eritrea, "harsh measures for
refusal to participate in national service were applied only
to Jehovah's Witnesses."

After hearing Ghebremedhin's testimony and reviewing
the record, the IJ issued an oral decision denying asylum
and withholding of deportation. The IJ began by assessing
Ghebremedhin's credibility, noting that there were "certain
aspects of his claim which raise questions," but ultimately
concluding that he had "testified consistently" and that
events basically occurred as he had described them. But the
problem with Ghebremedhin's claim, the IJ reasoned, was

that Ghebremedhin presented "no persuasive evidence which shows that the government of Eritrea has specifically targeted the respondent because of his membership as a Jehovah's Witness." The IJ observed that all Eritreans are required to participate in national service, and not just Jehovah's Witnesses. And, the IJ concluded, even assuming that Ghebremedhin was denied a business license because of his religion, that action would not rise to the level of persecution. Accordingly, the IJ determined that Ghebremedhin had not met his burden of establishing past persecution or a likelihood of future persecution, and denied asylum and withholding of deportation.

Ghebremedhin appealed the IJ's decision to the BIA, arguing that his evidence clearly established that he had been persecuted in Eritrea and would likely face further persecution should he be returned there. Ghebremedhin contended that the IJ had misinterpreted or ignored key portions of the country report, in particular the report's conclusion that Jehovah's Witnesses are singled out for harsh punishment because of their refusal to fulfill the national service requirement. The BIA affirmed without opinion.

Where, as here, the BIA summarily affirms the decision of an IJ, we review that IJ's decision as though it were the BIA's. *Ememe v. Ashcroft*, 358 F.3d 446, 450 (7th Cir. 2004). Our review of the BIA's denial of asylum is deferential; we ask only if the Board's decision has the support of "reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992). We will reverse only if the record is "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias-Zacarias*, 502 U.S. at 483-84.

In this court, Ghebremedhin principally argues that the IJ erred when he concluded that Ghebremedhin did not establish that he would likely be subjected to persecution on

account of his religion should he be returned to Eritrea. Asylum is available to aliens who are "unable or unwilling" to return to their home country because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *Ememe*, 358 F.3d at 450. The statute does not define the term "persecution," but we have held that it can include "non-life-threatening behavior such as torture and economic deprivation if the resulting conditions are sufficiently severe." *Capric v. Ashcroft*, 355 F.3d 1075, 1084 (7th Cir. 2004). A "well-founded fear" of persecution is an objectively reasonable awareness of danger; the probability of persecution need not actually be "more likely than not." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987).

Given the history of persecution of Jehovah's Witnesses detailed in the country report and the instances of mistreatment identified by Ghebremedhin, we are convinced that no reasonable factfinder, after having credited his testimony, could then conclude that Ghebremedhin lacks a well-founded fear of future persecution. As a starting point, the country report for Eritrea explains that Jehovah's Witnesses have been denied trading licenses, dismissed from civil service positions, and left with "economic, employment, and travel difficulties" because of their beliefs. U.S. Dep't of State, INT'L RELIGIOUS FREEDOM REPORT 2003 (Dec. 2003). Ghebremedhin himself recounted, in testimony the IJ found "consistent," that he lost his teaching position at an Eritrean university because of his faith and was subsequently denied the opportunity to use his expertise by opening his own consulting business. Indeed, the record contains a letter from the Eritrean government rejecting Ghebremedhin's license request precisely because the government had "found out" about his religious affiliation. Eritrea has made a concerted effort to prevent Jehovah's Witnesses generally, and Ghebremedhin specifically, from obtaining employment, and

the IJ cited no evidence that this prejudice has changed. The "deliberate imposition of substantial economic disadvantage" on account of Ghebremedhin's beliefs might even standing alone be sufficient to entitle him to asylum. *See Borca v. INS*, 77 F.3d 210, 216 (7th Cir. 1996); *Gormley v. Ashcroft*, 264 F.3d 1172, 1178 (9th Cir. 2004).

But we need not stop with economic disadvantage. Ghebremedhin's situation should he be returned to Eritrea would be even more dire, for that country has been known to incarcerate Jehovah's Witnesses who refuse to participate in national service on religious grounds. U.S. Dep't of State, INT'L RELIGIOUS FREEDOM REPORT 2003 (Dec. 2003). Some members of the church have been imprisoned for more than 9 years, although the maximum penalty for refusal to perform service is 3 years' imprisonment, and "extreme physical punishment" has been employed in an attempt to coerce them to serve. U.S. Dep't of State, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2003 (Feb. 2004). Ghebremedhin himself identified two close associates, a brother and a university colleague, who were incarcerated and beaten to death because they maintained that their convictions as Jehovah's Witnesses barred them from serving. Although it is well established that governments may draft citizens for military service and punish those who avoid the draft, *Mojsilovic v. INS*, 156 F.3d 743, 747 (7th Cir. 1998), it may be persecution to punish those who evade the draft based on genuine religious objections to military service, *Vujisic v. INS*, 224 F.3d 578, 581 (7th Cir. 2000); *Pelinkovic v. Ashcroft*, 266 F.3d 532, 537 (7th Cir. 2004). Further, the evidence in the record is quite clear that although Eritrea requires national service of all its citizens, "the Government has singled out Jehovah's Witnesses who were conscientious objectors for harsher treatment." U.S. Dep't of State, INT'L RELIGIOUS FREEDOM REPORT 2003 (Dec. 2003). When a country subjects a draft evader to more serious punishment than others who have also evaded service

because of his race, religion, nationality, social group, or political opinion, this amounts to persecution rather than simple nationalism. *Vujisic*, 224 F.3d at 581; *Mekhoukh v. Ashcroft*, 258 F.3d 118, 126 (1st Cir. 2004); *M.A. v. INS*, 858 F.2d 210, 215 (4th Cir. 1988). Eritrea's history of persecution of Jehovah's Witnesses has not previously escaped the notice of this court, *see Muhur v. Ashcroft*, 355 F.3d 958, 959 (7th Cir. 2004), and nothing in the record demonstrates that Ghebremedhin would not face the same dangers should he be returned there.

Because the evidence supporting Ghebremedhin's fear of persecution is so compelling that no reasonable factfinder could agree with the BIA's decision, we GRANT the petition for review and REVERSE the BIA's order. The case is REMANDED to the BIA to enter an order granting Ghebremedhin asylum.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*