Rosalba GAMEZ and Libeth Quinonez Gamez, Petitioners,

v.

Alberto R. GONZALES, Attorney General of the United States,* Respondent.

No. 03–3966.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 15, 2004.

Decided March 21, 2005.

Carlina Tapia-Ruano, Minsky, McCormick & Hallagan, Chicago, IL, for Petitioners.

George P. Katsivalis, Department of Homeland Security Office of the District Counsel, Chicago, IL, for Respondent.

Before KANNE, WOOD, and WILLIAMS, Circuit Judges.

## ORDER

Rosalba Gamez and her daughter Libeth [1] are citizens of Columbia. They en-

---

* Pursuant to Federal Rule of Appellate Procedure 43(c), we have substituted Alberto Gonzales for John Ashcroft as the named respondent.

1. Libeth, who is almost 19, qualifies as a child for purposes of claiming derivative asylum though her mother. 8 U.S.C. § 1158(b)(3)(B) (children under 21 may claim derivative asy-

tered the United States in June 2000 as non-immigrant visitors and overstayed their visas. The INS commenced removal proceedings against them, and they conceded removability and requested asylum, withholding of removal, and permission to voluntarily depart. In October 2002 they had a hearing before an Immigration Judge, who denied them asylum and withholding of removal but granted them permission to voluntarily depart. The Gamezes appealed to the BIA, but the BIA affirmed without opinion. The Gamezes have now filed a petition for review, but we deny the petition.

When Gamez lived in Bogota, Columbia, she worked as a public school teacher. She claims that she was harassed, intimidated, and threatened by local students and their parents, who were opposed to the government's funding of education. She asserts that the mistreatment was motivated by her political opinion and membership in a social group. Gamez's political opinion, as she explains it, is that she supports the government's funding of public schools. Her purported social group is not clearly identified, but it is either her school board, public school teachers, or government employees.

Gamez explained at her asylum hearing that there is tension in her school between people who support the government's funding of education and those who oppose it. She explained that her school was divided into two shifts, a morning shift and an afternoon shift, and a completely different set of students and teachers attended the school for each shift. According to Gamez, people in the morning shift and a few people in the afternoon shift were opposed to the government's funding of education, while she and others in the af-

ternoon shift openly supported the government's education policies. Gamez also asserts, without support, that the people in the morning shift are connected with the Revolutionary Armed Forces of Colombia (FARC).

Gamez described several incidents at the school that she believes constituted past persecution and also cause her to have a well-founded fear of future persecution. Not all of the incidents appear on their face to be related to politics, but Gamez explains that these incidents were part of the larger political debate at her school over public education. In discussing the incidents, however, Gamez also offered other explanations for why they occurred.

Gamez testified that in 1997 a group of teachers, students, and parents entered the school and "destroyed everything, especially the typing room and the library." She speculated that the vandals mistakenly believed that they or their children were not going to have access to the school's newly created "typing room." Gamez testified that the school's guard, who was injured trying to stop the vandalism, reported that the people responsible were from the morning shift.

Later that year the school received a new principal, whom Gamez described as a "government principal." Gamez testified that a group of people kidnapped the principal, tied him up, and left him locked in a room in the school unable to move or yell. Gamez explained that no one had ever identified the specific individuals responsible for the kidnapping, but she said that "they" (it is not clear who) determined it was a group of parents, teachers, and students from the morning shift. She explained that the people in the morning

lum); *Dandan v. Ashcroft*, 339 F.3d 567, 570 n. 1 (7th Cir.2003) (explaining that age is assessed at time petition is filed).

shift had always been opposed to the new principal because he was going to impose the government's educational standards in the school.

In a third incident, two of Gamez's students, who she describes as "guys that were involved with FARC," threatened to kill her if she did not change their failing grades to passing grades. Gamez testified that when she initially refused they waited outside the school for her, so she ultimately complied with their demand.

In a fourth incident, a "girl who was known to be associated with FARC" and her mother came to a PTA meeting and threatened Gamez. Apparently Gamez played some part in having the girl's older sister transferred to another school because the sister had allegedly been involved with FARC. The younger girl told Gamez at the PTA meeting that she had "better watch out," and that the "situation wasn't going to end like this."

In a fifth incident, "a student in a uniform" (Gamez did not say whether it was a school uniform or other kind of uniform) called Gamez inside the school and said to her, "[W]ell, I've come to let you know that they want me to tell you that you better be careful and you better disappear from this area soon, if you don't want somebody to do it for you." When asked at the hearing why the student had threatened her, Gamez explained that the people who supported the privatization of schools did not want her around because she worked on "government missions."

In addition to her testimony, Gamez submitted articles providing background information about the conflict in Columbia between the Colombian government and FARC. The government submitted the U.S. Department of State's 2001 Country Report on Human Rights Practices, which confirms that "the paramilitary groups and guerillas also regularly targeted public school teachers at the elementary and secondary levels for politically motivated killings." Gamez neither explained her belief nor submitted evidence to back up her belief that people in the morning shift at her school were connected with FARC.

In deciding Gamez's claim for asylum and withholding of removal, the IJ suggested but never explicitly said that he found Gamez credible. He ultimately concluded, however, that although Gamez had described a school plagued by internal chaos, she had not sufficiently established that any persecution she suffered or would suffer was connected with her social group or political opinion. The IJ said:

> [T]he incidents described do not lead to the conclusion that she was subjected to past persecution or that her fear of future persecution is based on any statutorily enumerated ground. Instead, they seem to depict a school rife with internal chaos and disorder. No nexus between the incidents described by the respondent and the overall political climate in Columbia has been demonstrated; nor has the respondent adequately establish [sic] the existence of any particular social group.

The IJ also concluded that Gamez had not addressed "the feasibility of internal relocation by perhaps obtaining employment at another school, in another location, or perhaps in a different field."

■ In her petition for review, Gamez argues first that the IJ erred in concluding that she did not suffer past persecution and did not have a well founded fear of future persecution. She points out that she testified about threats she received and that this court has said that "threats of a most immediate and menacing nature might, in some circumstances, constitute past persecution." *See Boykov v. INS*, 109 F.3d 413, 416 (7th Cir.1997). She contends

that the threats were immediate and escalating in nature, and that while initially vague, they became increasingly more pointed. She also points out that the morning shift members that she associates with the threats had already demonstrated their willingness and ability to carry out threats when they attacked the school's principal.

As *Boykov* explains, in the "vast majority" of cases, threats alone will not constitute past persecution but are more properly considered as evidence of the threat of future persecution. *Id.* Only the most immediate and serious threats can alone rise to the level of persecution. *Id.* In this case, Gamez testified about three threats, all delivered by students. The two boys who wanted their grades changed threatened to kill her and then waited outside the school for her, the girl whose sister was transferred told her to watch out, and the boy in the uniform demanded that she disappear. These threats were delivered by children, and Gamez did not adequately explain why she thinks the children were immediately capable of carrying out the threats. Gamez may suspect that FARC will back up the threats, but she never supplied the basis for that conclusion. Although Gamez argues that the immediacy of these threats is bolstered by the fact the certain people from the morning group attacked the school's principal, Gamez did not support her conclusion that these students could rally similar violence to back up their threats. These threats do not rise to the level of past persecution.

■ Threats can provide evidence of a well founded fear of future persecution. A petitioner must establish an objectively reasonable fear of future persecution and need not prove that persecution is more likely than not. *Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1119 (7th Cir.2004). The petitioner also must prove that the

feared persecution will be on account of one of the grounds listed in the Act. *See* 8 U.S.C. § 1101(a)(42); *Ghebremedhin*, 385 F.3d at 1119. In this case the IJ's denial of asylum hinges on his conclusion that Gamez failed to prove that the persecution she feared would be on account of either her political opinion or her membership in a social group. There is substantial evidence in the record to support this conclusion. *Ghebremedhin*, 385 F.3d at 1119.

Regarding Gamez's claim that she feared future persecution on the basis of her social group, the IJ said that she had not identified any particular social group. It is not entirely clear what "social group" Gamez claims to be in; she says in her brief that she was targeted "because she was a public school teacher, and a member of the local school's Board of Directors who supported the policies of the government in the schools." Whether her social group is the Board of Directors, public school teachers, or government employees generally, none of them fit the definition of a social group that we have developed in prior cases. We have said that a social group is a group of people with a common characteristic that members " 'either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.' " *Lwin v. INS*, 144 F.3d 505, 512 (7th Cir. 1998) (quoting *In Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)); *see also Ahmed v. Ashcroft*, 348 F.3d 611, 617 (7th Cir.2003) (explaining that an applicant must prove that her membership in a social group is "motivated by beliefs that she should not be required to change as a matter of conscience"). In deciding *Lwin*, we rejected the Ninth Circuit's more permissive definition of a social group as a " 'collection of people closely affiliated with each other, who are actuated by some common impulse or interest.' " *Lwin*, 144

F.3d at 511 (quoting *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986)). Gamez revealed in her testimony that she could work as a private school teacher and be free from persecution, and conceded that her choice to remain at a public school was a matter of economics. She explained that the nongovernmental schools pay poorly and she is a single mother struggling to pay for her daughter's school and all of their expenses. Though we sympathize with the difficulties she faces, her choice to remain in the social group that she is in does not seem to come down to a "matter of conscience." *Ahmed*, 348 F.3d at 617. The IJ was correct that she failed to make out a claim based on social group persecution.

Gamez also alleged that the persecution she feared was on account of her political opinion of being in favor of the government's funding of schools. The IJ concluded that she had established only that her school was steeped in chaos, and not that any harm she might suffer would be on the basis of her political opinion.

We agree with the IJ that Gamez failed to prove that the harm she feared was on account of her political opinion. Gamez's assertion that the persecution she feared would be on account of her political opinion was built upon a string of assumptions that she has failed to back up with explanation or evidence. She assumes that the students' threats were motivated by her political opinion rather than grades she gave and the role she played in expelling the student who allegedly had ties to FARC. She assumes that the students who threatened her were connected to the group of people who kidnapped the principal. And she assumes that the people who pose a threat to her are aligned with FARC. The background evidence that Gamez provided, evidencing that "[b]oth paramilitary groups and guerillas also regularly target-ed public school teachers at the elementary and secondary levels for politically motivated killings," does not help her case without proof that the paramilitary groups and guerillas are connected with the people she fears. *See* U.S. State Department Country Report on Human Rights Practices for Colombia (2001).

There is substantial evidence in the record to support the IJ's conclusion that Gamez did not meet her burden of proving that the persecution she feared was on account of a protected ground. We deny the petition for review.