# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-3933

HANNA H. FESSEHAYE,

*Petitioner*,

v.

ALBERTO R. GONZALES,
United States Attorney General,

*Respondent*.

_____

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A78-356-582

_____

ARGUED JANUARY 7, 2005—DECIDED JULY 8, 2005

_____

Before POSNER, RIPPLE and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* The Immigration and Naturalization Service ("INS") brought removal proceedings against Eritrean citizen Hanna Fessehaye. She filed an asylum claim and application for withholding of removal, but obtained no relief. She then brought a motion to reopen her case. *See* 8 U.S.C. § 1229a(c). In pertinent part, she alleged changed circumstances in that she had become a Jehovah's Witness and consequently feared persecution because of her religious affiliation if sent back to Eritrea. She also asserted

that, if returned to Eritrea as a failed asylum seeker, she would suffer persecution. The Board of Immigration Appeals (the "BIA" or "Board") denied her motion to reopen. In its view, she had failed to present sufficient evidence to make out a prima facie case for relief. Ms. Fessehaye now petitions for review of that decision. For the reasons set forth in the following opinion, we grant the petition and remand the case to the BIA for further proceedings.

# I

# BACKGROUND

## A. Facts

Ms. Fessehaye was born in the Ethiopian province of Tigray, but relocated to the province of Eritrea to work as a teacher. In the 1990s, Eritrea became independent following an internationally-monitored referendum. Ms. Fessehaye became a citizen of Eritrea by voting in that referendum. Tensions between the newly independent nation and Ethiopia escalated into armed conflict between 1998 and 2000; animosity between the two countries continues to this day.

On August 22, 1998, Ms. Fessehaye entered the United States on a six-month tourist visa. She remained in the country beyond the expiration date of that visa. In October 1998, she married Ghebregziabher Ghebremedhin, another Eritrean citizen who also had entered the United States on a tourist visa and had remained beyond its expiration. The couple has two children who are citizens of the United States, a son born in 1999 and a daughter born in 2001.

In 1998, the INS brought removal proceedings against Mr. Ghebremedhin; he conceded that he was subject to deporta-

tion, but sought asylum. His asylum application was based on past persecution and a fear of future persecution because he is a Jehovah's Witness—a church that is subject to widespread persecution and distrust in Eritrea. The Immigration Judge ("IJ") denied his asylum application, and the BIA affirmed. Mr. Ghebremedhin appealed to this court.

Meanwhile, Ms. Fessehaye applied to the INS for asylum. In her application, she claimed to have a well-founded fear of persecution. She based this claim on the fact that her life history involved connections with both Ethiopia and Eritrea, two sovereign countries that have been at war and now co-exist in an environment of continuing distrust. Ms. Fessehaye claimed that she faced persecution if returned to Ethiopia because she had voted in the Eritrean referendum and had become an Eritrean citizen. Similarly, she believed that she would be persecuted if returned to Eritrea because she was a native of Tigray, a province that remained part of Ethiopia. Following a hearing, the IJ denied Ms. Fessehaye's request for asylum and her petition for withholding of removal in February 2001. The BIA affirmed without opinion in November 2002.

## B. Motion to Reopen

Ms. Fessehaye did not seek review of the BIA's decision, but instead filed a timely motion to reconsider; the Board denied that motion. She then filed a timely motion to reopen, *see* 8 U.S.C. § 1229a(c)(7),[1] and included supporting

---

[1] At the time Ms. Fessehaye filed her motion, the provisions governing motions to reopen were found at 8 U.S.C. § 1229a(c)(6). Congress recently amended § 1229a(c), *see* Emergency Supplemental Appropriations Act for Defense, the Global War on

(continued...)

evidence and an updated asylum application as required by 8 C.F.R. § 1003.2(c).[2] In her motion to reopen, Ms. Fessehaye essentially raised four grounds for reopening. We shall discuss each of her submissions and the BIA's resolution.

First, Ms. Fessehaye submitted that, in light of our decision in *Nwaokolo v. INS*, 314 F.3d 303 (7th Cir. 2002), her

---

[1] (...continued)
Terror, and Tsunami Relief, Division B—REAL ID Act of 2005, Pub. L. No. 109-13, § 101(d), 119 Stat. 231, and as a result the provision governing Ms. Fessehaye's motion presently is located at 8 U.S.C. § 1229a(c)(7). The REAL ID Act did not change the substance of the former § 1229a(c)(6), and we therefore cite to the provision as currently numbered.

[2] A petition to reopen "must be accompanied by the *appropriate application for relief* and all supporting documentation." 8 C.F.R. § 1003.2(c)(1) (emphasis added). Ms. Fessehaye attached an updated asylum request in order to comply with this requirement. *See* A.R. at 20 ("I am making this application as part of my Motion to Reopen my first request for asylum."). The application attached to her motion to reopen does not differ materially from her first asylum request, the only differences being that (1) the more recent application is made on the October 2001 revision of Form I-589, (2) the updated application includes the new information that Mr. Ghebremedhin's case is before the BIA and that the couple's children are citizens of the United States, and (3) the updated application refers the Board to affidavits establishing the new facts forming the basis of Ms. Fessehaye's motion to reopen.

At the time of her motion, regulatory provisions governing motions to reopen and to reconsider were codified at 8 C.F.R. § 3.2. A reorganization in 2003 placed the provisions in their current location at 8 C.F.R. § 1003.2. There are no differences between the former section 3.2 and the current section 1003.2 that affect Ms. Fessehaye's appeal, and, for ease of reference, we cite to the current regulations.

daughter would be subject to female genital mutilation if she returned to Eritrea with her mother. In support of this claim, Ms. Fessehaye attached the State Department report on human rights practices in Eritrea, *see* A.R. at 43; U.S. Dep't of State, *Eritrea*, *in* Country Reports on Human Rights Practices—2001 (2002) ("2001 Country Report"). The Board rejected this claim on the ground that the asserted danger was not new and had been available at the time of her hearing. The Board further found no statutory basis to maintain a claim based on the fear of future harm to a child and thus determined that Ms. Fessehaye could not make out a prima facie case on this asserted basis for asylum.

Second, she claimed that she had adopted her husband's religion and was a practicing Jehovah's Witness. Because of this conversion, she feared religious persecution—essentially the same religious persecution that her husband had asserted as the basis for his asylum claim. In support of her motion to reopen, Ms. Fessehaye included her own affidavit in which she stated that she had been an Orthodox Christian before her marriage, but had decided to convert to Jehovah's Witness after her marriage and participation in her husband's religious events. The affidavit further stated that Ms. Fessehaye had not completed the final ritual for full membership in the faith, and thus the church elders could not provide additional evidence of her conversion within the ninety-day time limit for filing a motion to reopen. *See* 8 C.F.R. § 1003.2(c)(2). Her affidavit continued to detail the persecution faced by Jehovah's Witnesses in Eritrea, which she feared would be visited upon her and her children if she returned to the country.[3] She cited the persecution of

---

[3] In particular, Ms. Fessehaye—and her husband in his proceedings—submitted that Jehovah's Witness beliefs regarding
(continued...)

Jehovah's Witnesses described in the 2001 Country Report. The BIA rejected this claim because it determined that Ms. Fessehaye had failed to present sufficient evidentiary materials in support of her conversion. In particular, the Board found insufficient her single affidavit because, in its view, affidavits from her husband or church elders attesting to her Jehovah's Witness faith could have been obtained easily.

Third, Ms. Fessehaye contended that the State Department had recognized—in a report unavailable at the time of her asylum hearing—that Eritrean citizens who return to the country after failed attempts to obtain asylum abroad are subject to investigation and are allowed to enter only on a "case-by-case basis." A.R. at 11; *see id.* at 51; 2001 Country Report § 2.d ("Applications to return from citizens living abroad who have . . . been declared ineligible for political asylum by other governments, are considered on a case-by-case basis."). She claimed that, because she had sought asylum in the United States, she would be investigated upon her reentry to Eritrea; this investigation would in turn

---

[3] (...continued)
military service would run afoul of Eritrea's compulsory national service requirements. Jehovah's Witnesses may not serve in a nation's armed forces, but, as detailed in an Amnesty International press release, A.R. at 64, persons refusing to serve in Eritrea could face penalties of three years' imprisonment or even death. In addition, Jehovah's Witness beliefs regarding the service of earthly governments mean that practitioners cannot recognize the legitimacy of any "government[ ] of men." *Id.* at 23. Because of the Witnesses' refusal to recognize the Eritrean government, Ms. Fessehaye claimed that government authorities deeply distrusted Jehovah's Witnesses, often refusing to issue passports, food rations or government housing and frequently imprisoning practitioners.

lead to her arrest or detention because it would reveal her religious beliefs, as well as her criticism of the Eritrean government for forcing her mother out of the country.[4] In addition to the 2001 Country Report, Ms. Fessehaye also attached an Amnesty International press release that detailed the treatment of former asylum seekers who returned to Eritrea. In rejecting this contention, the Board believed that the 2001 Country Report and the Amnesty International press release were insufficient evidence that Ms. Fessehaye faced persecution as a former asylum seeker.

Fourth, Ms. Fessehaye reasserted in her affidavit, although not in her motion, a ground raised in her previous asylum application: that Eritrean authorities maintained a policy of arresting ethnic Ethiopians and deporting them to Ethiopia. She argued that "new reports" continued to be published detailing this practice. A.R. at 24. The BIA dismissed this contention as mere speculation, unsupported by the country reports or other evidence.

Ms. Fessehaye now seeks review of the denial of her motion to reopen. More specifically, she asks that we review the Board's decision with respect to her contentions that she has a well-founded fear of persecution because of her religious conversion, her failed attempt to seek asylum and the possibility of further deportation to Ethiopia. She does not challenge the BIA's determination of her derivative female genital mutilation claim.

Before oral argument in this case, our court rendered its decision on Mr. Ghebremedhin's appeal. *Ghebremedhin v.*

---

[4] In her initial asylum application, to establish past persecution under 8 C.F.R. § 208.13(b)(1), Ms. Fessehaye offered evidence that her mother had been forced from the country by Eritrean authorities. In her motion to reopen, she claimed to fear persecution for speaking out against her mother's treatment.

*Ashcroft* ("*Ghebremedhin I*"), 385 F.3d 1116 (7th Cir. 2004). In *Ghebremedhin I*, we noted that Mr. Ghebremedhin presented evidence of persecution "so compelling that no reasonable factfinder could agree with the BIA's decision" denying him asylum. *Id.* at 1120. We thus reversed the BIA and remanded with instructions to the Board to grant his asylum application. *Id.* We subsequently modified the opinion by remanding to the agency for further proceedings consistent with *Ghebremedhin I. Ghebremedhin v. Ashcroft* ("*Ghebremedhin II*"), 392 F.3d 241, 244 (7th Cir. 2004). Having determined that Mr. Ghebremedhin presented evidence "so compelling" that no reasonable factfinder would have denied his application, we must now resolve his wife's appeal.

## II

## DISCUSSION

### A.  Standard of Review

The Board's authority to grant or deny a motion to reopen is discretionary; we therefore review deferentially its decision for abuse of discretion.[5] Motions to reopen are

---

[5]  Prior to 1996, "the authority for [motions to reopen] derive[d] solely from regulations promulgated by the Attorney General." *INS v. Doherty*, 502 U.S. 314, 322 (1992). Passage of the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-546, amended the Immigration and Nationality Act to include statutory requirements for a motion to reopen. 8 U.S.C. § 1229a(c)(7).

Following IIRIRA, the INS amended its regulations to the current form. Both the prior and current regulations emphasize that the decision to reopen rests, within certain restrictions, with the BIA. *See Doherty*, 502 U.S. at 323 (noting that 8 C.F.R. § 3.2
(continued...)

comparable to motions for rehearing or for a new trial, and thus are "strongly disfavored." *Selimi v. Ashcroft*, 360 F.3d 736, 739 (7th Cir. 2004) (citing *INS v. Doherty*, 502 U.S. 314 (1992)); *see also Xu Long Lu v. Ashcroft*, 259 F.3d 127, 131 (3d Cir. 2001). "But granting deference to administrative tribunals does not mean we have clothed their rulings with

---

[5] (...continued)

(1987) required denial in certain circumstances but did not specify when to grant a motion to reopen, and "[t]he granting of a motion to reopen is thus discretionary"); *see also* 8 C.F.R. § 1003.2(a) ("The decision to grant or deny a motion to reopen . . . is within the discretion of the Board . . . ."). We have thus continued to review the BIA's decisions to reopen for abuse of discretion after IIRIRA, as we did before. *See Laboski v. Ashcroft*, 387 F.3d 628, 631 (7th Cir. 2004) (citing *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003)); *see also Pelinkovic v. Ashcroft*, 366 F.3d 532, 536 (7th Cir. 2004).

Ms. Fessehaye submits that, in codifying procedures for a motion to reopen, IIRIRA changed the degree of deference that we owe to the BIA's decision, and for support she cites discussion in *Medina-Morales v. Ashcroft*, 371 F.3d 520 (9th Cir. 2004). We cannot accept this argument. The question presented in *Medina-Morales* was whether the discretion to grant or deny motions to reopen, vested in the Attorney General through 8 U.S.C. § 1229a(c)(7), was such that the decision was unreviewable under 8 U.S.C. § 1252(a)(2)(B)(ii). Having found jurisdiction, the Ninth Circuit proceeded to review the BIA's decision for abuse of discretion. Nothing in *Medina-Morales* indicates that we ought to modify our review of the BIA's discretion in this case. *See, e.g., Guo v. Ashcroft*, 386 F.3d 556, 562 (3d Cir. 2004) ("[O]ur review is highly deferential: we review the denial of a motion to reopen for abuse of discretion. Discretionary decisions of the [Board] will not be disturbed unless they are found to be arbitrary, irrational, or contrary to law." (internal quotation marks and citation omitted)).

that kind of power expressed in the maxim the 'king can do no wrong.' " *Zhao v. United States Dep't of Justice*, 265 F.3d 83, 86 (2d Cir. 2001). A tribunal abuses its discretion when it acts arbitrarily or capriciously and in such cases no deference is due. *Id.*

In reviewing Ms. Fessehaye's claims, we are mindful of the substantive and procedural changes to the immigration laws recently enacted by Congress through the REAL ID Act. *See* Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, Division B—REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231. As relevant here, the REAL ID Act modified the standard of review for orders of removal, *id.* § 101(e), a change that applies "to all cases in which the final administrative removal order is or was issued before, on, or after" the date of passage, *id.* § 101(h)(3). We turn to that provision to assess its impact on our review of Ms. Fessehaye's claims.

Section 101(e) amends 8 U.S.C. § 1252(b)(4) by adding the following sentence: "No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 208(b)(1)(B) [8 U.S.C. § 1158(b)(1)(b)], 240(c)(4)(B) [8 U.S.C. § 1229a(c)(4)(B)], or 241(b)(3) [8 U.S.C. § 1231(b)(3)], unless the court finds, pursuant to section 242(b)(4)(B), that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." Given the language employed by Congress in this section, we do not believe that new provision applies to our review of the denial of Ms. Fessehaye's motion to reopen in its current posture. By its terms, section 101(e)'s effect does not apply to review of motions to reopen under § 1229a(c)(7). Furthermore, section 101(e) dictates the standard of review to be applied when the "trier of fact" has made a determination as to the

necessity of corroborating evidence. However, the BIA does not act as a "trier of fact" when it decides whether to grant or deny a motion to reopen. Thus, the standard of review set forth in the REAL ID Act has no direct application to our present review.

### B. Merits

Under 8 U.S.C. § 1229a(c)(7), an applicant may file, within ninety days of the order of removal, a motion to reopen asylum proceedings based on new facts. "A motion to reopen seeks fresh consideration on the basis of newly discovered facts or a change in circumstances since the hearing . . . ." Charles Gordon et al., Immigration Law and Procedure § 3.05[7][a] (2004); *see Canaveral Toban v. Ashcroft*, 385 F.3d 40, 45 (1st Cir. 2004). The statute provides little guidance on the form or sufficiency of a motion to reopen; it simply directs that the motion "shall state the new facts that will be proven at a hearing to be held if the motion is granted, and shall be supported by affidavits or other evidentiary material." 8 U.S.C. § 1229a(c)(7)(B). The applicable regulations largely repeat this statutory language: "A motion to reopen proceedings shall state the new facts that will be proven at a hearing to be held if the motion is granted and shall be supported by affidavits or other evidentiary material." 8 C.F.R. § 1003.2(c)(1). The BIA may deny a motion to reopen based on the petitioner's " 'failure to establish a prima facie case for the underlying relief sought' " and " 'failure to introduce previously unavailable, material evidence.' " *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003) (quoting *Doherty*, 502 U.S. at 323).[6]

---

[6] The BIA also may deny a motion to reopen after "a determination that even if these requirements were satisfied, the movant
(continued...)

**1.**

We agree with the BIA that Ms. Fessehaye's application to reopen based on the Eritrean government's policy of deporting ethnic Ethiopians fails to "introduce previously unavailable, material evidence." The sole support for this claim—which was not argued in the motion to reopen itself—is a statement in the affidavit accompanying her motion that "new reports continue to be published of the government's arrest of returning Eritreans and the continuing deportation (repatriation) of Ethiopians from Eritrea to Ethiopia." A.R. at 24. She failed to attach such "new reports" to her motion, and indeed the materials that she did attach seem to indicate the opposite. *See id.* at 47; 2001 Country Report § 1.d ("By mid-August the Government had repatriated more than 21,000 Ethiopians to Ethiopia; however, all of these persons were repatriated voluntarily . . . ."); *see also* A.R. at 51; 2001 Country Report § 2.d ("The Government stated publicly on several occasions that it had not adopted a policy of deporting all Ethiopian nationals from the country. After August 2000, forced, mass deportations stopped . . . ."); A.R. at 52; 2001 Country Report § 2.d ("There were no reports of the forced return of persons to a country where they feared persecution.").

**2.**

However, we reach a different conclusion as to the BIA's decision to deny reopening on Ms. Fessehaye's religious

---

[6] (...continued)
would not be entitled to the discretionary grant of relief which he sought." *See Awad*, 328 F.3d at 341. There is no indication in the record that the BIA would have refused to grant asylum to Ms. Fessehaye even if she had proven entitlement to that relief.

conversion claim. In determining that Ms. Fessehaye's evidence in support of her conversion was insufficient, the BIA found

> that her motion to reopen is not appropriately supported by affidavits from her husband or religious leaders or any other evidentiary materials to support her assertion that she is, in fact, a Jehovah Witness even though such affidavits could easily have been obtained and presented.

A.R. at 3. Although the Board's decision thus makes clear that it believed that Ms. Fessehaye's submissions were inadequate, the decision does not explain *why* the Board viewed her evidence as insufficient.

Ms. Fessehaye sought to reopen her case and to apply for asylum based on her religious conversion. To be eligible for asylum, Ms. Fessehaye had to demonstrate that she was a "refugee" under 8 U.S.C. § 1101(a)(42)(A). *See* 8 U.S.C. § 1158(b)(1). Among other things, a refugee is a person unable or unwilling to return to her country because of a well-founded fear of persecution on the basis of religion. *Id.* § 1101(a)(42); *Awad*, 328 F.3d at 341. In asking the Board to reopen its earlier determination, Ms. Fessehaye claims that she had a well-founded fear of persecution because she was a practicing Jehovah's Witness.

The procedures for establishing eligibility for asylum are described in 8 C.F.R. § 208.13. Whether Ms. Fessehaye attempted to establish prima facie eligibility by demonstrating a well-founded fear of persecution under 8 C.F.R. § 208.13(b)(2)(i),[7] or under the per se category in section

---

[7] 8 C.F.R. § 208.13(b)(2)(i) provides that:

(continued...)

208.13(b)(2)(iii),[8] it is clear that she met most of the require-
ments. We already have noted the difficult circumstances
facing Jehovah's Witnesses in Ethiopia. Indeed, in
Mr. Ghebremedhin's case, we considered State Department
reports and his testimony and determined that no reason-
able factfinder could conclude that he lacked a well-
founded fear of persecution. *Ghebremedhin I*, 385 F.3d at

---

[7] (...continued)

    (i) An applicant has a well-founded fear of persecution if:

        (A) The applicant has a fear of persecution in his or her
        country of nationality or, if stateless, in his or her coun-
        try of last habitual residence, on account of race, reli-
        gion, nationality, membership in a particular social
        group, or political opinion;

        (B) There is a reasonable possibility of suffering such
        persecution if he or she were to return to that country;
        and

        (C) He or she is unable or unwilling to return to, or avail
        himself or herself of the protection of, that country
        because of such fear.

[8] As relevant here, 8 C.F.R. § 208.13(b)(2)(iii) limits the
Immigration Judge's scope of review in certain cases. When an
applicant "establishes that there is a pattern or practice in his or
her country . . . of persecution of a group of persons similarly
situated . . . on account of race, religion, nationality, membership
in a particular social group, or political opinion," *id.*
§ 208.13(b)(2)(iii)(A), and "establishes his or her own inclusion in,
and identification with, such group of persons such that his or
her fear of persecution upon return is reasonable," *id.*
§ 208.13(b)(2)(iii)(B), "the asylum officer or immigration judge
shall not require the applicant to provide evidence that there is a
reasonable possibility he or she would be singled out individ-
ually for persecution," *id.* § 208.13(b)(2)(iii).

1119-20.[9] Ms. Fessehaye has demonstrated that, *if she is a practicing Jehovah's Witness*, she has good reason to believe that she will be singled out for persecution upon her return to Eritrea. *See* 8 C.F.R. § 208.13(b)(2)(i); *Petrovic v. INS*, 198 F.3d 1034, 1037 (7th Cir. 2000). She also has presented a "pattern and practice of persecution of an identifiable group, to which [s]he belongs, such that" her fear of persecution "is reasonable." *Capric v. Ashcroft*, 355 F.3d 1075, 1094 (7th Cir. 2004); *see* 8 C.F.R. § 208.13(b)(2)(iii).

The qualification, "if she is a practicing Jehovah's Witness," thus remains the only issue in this case. In this respect, we note that Ms. Fessehaye's submission complied with the evidentiary requirements of 8 C.F.R. § 1003.2(c)(1) that she "state new facts" that are "supported by affidavits or other evidentiary material." On a motion to reopen that is based simply on paper submissions, as opposed to in-person testimony, "the BIA is required to accept the facts stated in the alien's affidavit unless they are inherently unbelievable." *Ordonez v. INS*, 345 F.3d 777, 786 (9th Cir. 2003).

In our view, Ms. Fessehaye clearly supplied evidence of the quality and quantity that the Board reasonably could expect. Ms. Fessehaye provided an affidavit regarding a "new fact," her decision to convert to her husband's faith, and also explained therein why "official" confirmation of the conversion could not be submitted within the given time limits. There is nothing inherently unbelievable about Ms. Fessehaye's claim to have adopted the religion of her spouse. Nor is there some other basis on which to question

---

[9]   Mr. Ghebremedhin's case is not the only one discussing a well-founded fear based on Eritrea's persecution of Jehovah's Witnesses. *See Muhur v. Ashcroft*, 355 F.3d 958, 959-60 (7th Cir. 2004).

the veracity of Ms. Fessehaye's statements regarding her conversion; for instance, Ms. Fessehaye's affidavit does not contain internal inconsistencies that call into question the veracity of her statements, nor is the affidavit at odds with other materials that Ms. Fessehaye submitted in support of her motion to reopen.

Nevertheless, the BIA took the view that Ms. Fessehaye's uncorroborated affidavit failed to establish that she is a practicing Jehovah's Witness. We must conclude, however, that, on this record, requiring corroboration of her faith commitment in order to establish prima facie eligibility was arbitrary and capricious and constituted an abuse of discretion. The regulations provide that, in deciding an asylum application *on the merits*, "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). Under the plain language of the rule, there is no blanket requirement for an asylum seeker to offer additional affidavits before her prima facie burden is satisfied.

The question becomes what more could Ms. Fessehaye *reasonably* have been expected to present to the BIA by way of evidence to establish her conversion? In evaluating the Board's use of that criteria, we have made it clear that the touchstone must be the reasonableness of such a criterion in the circumstances presented by the particular case. *See Gontcharova v. Ashcroft*, 384 F.3d 873, 877 (7th Cir. 2004); *Capric*, 355 F.3d at 1085 n.4. We wrote in *Balogun v. Ashcroft*, 374 F.3d 492, 502 (7th Cir. 2004):

> [T]he corroboration requirement should be employed reasonably. It is always possible to second-guess the petitioner as to what evidence would be most cogent, and, consequently, there is a distinct danger that, in practice, the corroboration requirement can slip into

> "could have-should have" speculation about what evidence the applicant could have brought in a text-book environment.

To enable us to conduct our review, we have required that the BIA explain its decisions to require corroborating evidence. "Such an explanation should include, at a minimum: (1) an explicit credibility finding; (2) an explanation of why it is reasonable to expect additional corroboration; and (3) an account of why the petitioner's explanation for not producing that corroboration is inadequate." *Gontcharova*, 384 F.3d at 877; *see also El-Sheikh v. Ashcroft*, 388 F.3d 643, 647 (8th Cir. 2004). In this case, the BIA made no determination that Ms. Fessehaye lacked credibility. Nor did it provide any explanation as to why it was reasonable to expect additional affidavits beyond the conclusory statement that "such affidavits could easily have been obtained." A.R. at 3. Ms. Fessehaye explained to the Board that she could not obtain affidavits from church elders because she had not completed the conversion process; the BIA failed to come to grips with that explanation and failed to explain why Ms. Fessehaye's explanation was inadequate.[10]

---

[10] As noted above, we are not, in this review, bound by the new standard of review set forth in the REAL ID Act that prevents a reviewing court from reversing the determination of a trier of fact with respect to the availability of corroborating evidence unless this court finds that "a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable." REAL ID Act § 101(e). But if, upon reopening her application, it is determined that Ms. Fessehaye must corroborate her conversion, and she again fails to provide such corroboration, this court will review that determination according to the Act's strictures.

However, on the record before us, we fail to see what more Ms. Fessehaye could provide to establish her spiritual adherence to a
(continued...)

We never have held that an applicant's affidavit alone is insufficient to establish membership in a certain group. Indeed, one's religion is inherently a "personal experience[ ] not reasonably subject to verification," *In re S-M-J*, 21 I. & N. Dec. 722, 725 (BIA 1997), and we have expressed concern about the Board's requiring more evidence of conversion than reasonably can be expected, especially in the absence of a finding that the alien is not credible, *Muhur v. Ashcroft*, 355 F.3d 958, 960 (7th Cir. 2004) (noting that many authentic believers, including members of churches with more structure than Jehovah's Witnesses, would fail a test based on objective indicators like knowledge of church doctrine); *Bastanipour v. INS*, 980 F.2d 1129, 1132-33 (7th Cir. 1992) (holding that it was inappropriate to question a claimed conversion from Islam to Christianity when there was no reason to question the applicant's sincerity and when apostasy was itself an offense under Islam); *cf.* 8 U.S.C. § 1229a(c)(4)(C) ("There is no presumption of credibility, however, if no adverse credibility determination is explicitly made, the applicant or witness shall have a rebuttable presumption of credibility on appeal."). *But see Najafi v. INS*,

---

[10] (...continued)

new faith. Her affidavit evidences the reasonable reluctance of church elders to corroborate her conversion until she has completed the church's requirements. Under the circumstances presented here, "a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence is unavailable." Moreover, although it is true that Ms. Fessehaye may be able to present affidavits of other Jehovah's Witnesses corroborating her attendance at religious celebrations or related events, if the sincerity of Ms. Fessehaye's beliefs are not at issue—and there is no evidence that the BIA questioned Ms. Fessehaye's credibility—those affidavits only could establish Ms. Fessehaye's outward actions, not the sincerity of her beliefs.

104 F.3d 943, 949 (7th Cir. 1997) (distinguishing *Bastanipour* and noting that "word of conversion is not enough").

There is no question that Mr. Ghebremedhin is a practicing Jehovah's Witness. Where, as here, the movant credibly claims to have converted to her spouse's religion, we see no necessity, absent exceptional circumstances, for the Board to require further corroboration. *See Limsico v. INS*, 951 F.2d 210, 213 (9th Cir. 1991) (requiring BIA to accept as true facts in applicant's affidavit unless statements were inherently unbelievable). We must conclude that, in imposing such a requirement on Ms. Fessehaye in this case, the Board abused its discretion.

**3.**

Finally, Ms. Fessehaye argued for the reopening of her case because she "feared that she may be arrested and detained as a result of her 1) religious conversion, 2) because of her criticism and opposition to the government of Eritrea for forcing her mother from Eritrea, and 3) because she applied for asylum in the United States." A.R. at 11. Her first argument fundamentally is a repeat of her claim to fear persecution based on her new faith; for reasons considered above, we hold that Ms. Fessehaye offered new evidence and made out a prima facie case on this ground that warrants reopening her case.

However, her second argument, that she fears persecution as a critic of the Eritrean government, fails for two reasons. First, her claimed religious conversion and status as a former asylum seeker both arose after the BIA denied her first asylum claim, but there is no evidence that her criticism of the Eritrean government occurred after the BIA's first decision. Her claim therefore does not constitute "previously unavailable, material evidence." *Awad*, 328 F.3d at

341. Indeed, Ms. Fessehaye did not mention her alleged criticism of the Eritrean government in her initial asylum application; rather, she introduced evidence of her mother's persecution to establish that the government had a pattern of persecuting her family. Second, Ms. Fessehaye presented no evidence with her motion to reopen establishing that she actually criticized the government for its treatment of her mother. Indeed, the only "evidence" she offered is a statement in the motion and affidavit;[11] unlike the religious conversion claim, a claim both uniquely unsuited to second-guessing by immigration officials and also corroborated by her husband's faith, there is no evidence that Ms. Fessehaye was a government critic. She thus may not rely on her claimed past criticism of the Eritrean government as a ground for reopening.

The third argument, a fear of persecution because Ms. Fessehaye unsuccessfully sought asylum, does raise new ground. But to be eligible for asylum on this ground, Ms. Fessehaye still must establish a prima facie case by demonstrating a well-founded fear of persecution under 8 C.F.R. § 208.13(b)(2)(i). We may assume for the moment that her status as a former asylum seeker qualifies her for "membership in a particular social group" as described in 8 C.F.R. § 208.13(b)(2)(i)(A). However, Ms. Fessehaye's difficulty lies in establishing a "reasonable possibility of suf-

---

[11] The only mentions of her criticism of the Eritrean government are single statements in the motion and in her affidavit. *See* A.R. at 11 ("Respondent fears that she may be arrested and detained . . . because of her criticism and opposition to the government of Eritrea . . . ."); *id.* at 24 ("I believe that on investigation [the Eritrean government] will learn that . . . I object to the policies of the Eritrean government, especially those which were the cause of deporting my mother . . . .").

fering such persecution" on this basis if she were to return to her country. 8 C.F.R. § 208.13(b)(2)(i)(B).

She attempted to meet her burden under the "reasonable possibility" prong by pointing to a statement in the 2001 Country Report indicating that the right of return for Eritreans who "have been declared ineligible for political asylum by other governments [is] considered on a case-by-case basis." A.R. at 51; 2001 Country Report § 2.d. She also attached a press release from Amnesty International purporting to offer further support. However, neither the 2001 Country Report nor the Amnesty International press release establish Ms. Fessehaye's prima facie eligibility. The Country Report merely notes that Ms. Fessehaye's situation will be considered individually; it does not indicate a "reasonable possibility" that she will be denied entry.

Additionally, the Amnesty International press release does not provide support for this particular claim. The press release notes only that 223 Eritreans were detained after being deported from Malta, that the 223 were among a group of 400 that arrived in Malta, and that about half that number had applied for asylum. A.R. at 63. This does not evidence a policy of detaining or denying entry to failed asylum seekers. In fact, it appears from the press release that the primary targets of detention in Eritrea are those "who are suspected of opposition to the government or having evaded military service." *Id.* at 64. We are certain that Ms. Fessehaye may not seek relief as a member of the former of these two categories, as we have said that there is no evidence that Ms. Fessehaye was an opposition leader. But the press release's mention of the persecution of those who have evaded mandatory military service, in light of our discussion of Ms. Fessehaye's conversion and the tenets of her faith, provides further evidence establishing Ms. Fessehaye's prima facie eligibility for asylum on that ground.

## Conclusion

The tendered evidence of religious conversion is "previously unavailable, material evidence" and makes out a prima facie showing of eligibility, and Ms. Fessehaye is entitled to a hearing. The Board clearly abused its discretion in requiring more evidence before reopening Ms. Fessehaye's case. Therefore, we grant the petition for review and remand to the BIA for further proceedings consistent with this opinion.

PETITION FOR REVIEW GRANTED;
REVERSED and REMANDED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*