# United States Court of Appeals
## For the First Circuit

No. 03-1958

MARTIN E. CANAVERAL TOBAN,

Petitioner,

v.

JOHN ASHCROFT, ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER

OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch and Lipez, <u>Circuit Judges</u>, and
Rosenn,[*] <u>Senior Circuit Judge</u>.

Walter J. Gleason for petitioner.
    William C. Minick, Attorney, Office of Immigration Litigation,
with whom Peter D. Keisler, Assistant Attorney General, Civil
Division, and Christopher C. Fuller, Senior Litigation Counsel,
Office of Immigration Litigation, were on brief, for respondent.

September 22, 2004

[*]Of the Third Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.    Petitioner Martin E. Canaveral Toban ("Canaveral"), a native and citizen of Colombia, seeks review of the Board of Immigration Appeals' (BIA) denial of his motion to reopen its summary affirmance of the Immigration Judge's (IJ) deportation order.    Recognizing that some of Canaveral's claims were not properly raised in a motion to reopen, the BIA treated his motion as both a motion to reopen and a motion to reconsider.    With one minor exception, Canaveral focuses his appeal exclusively on the portion of the BIA's opinion denying his motion to reopen.    He argues that the BIA should have reopened the proceedings to permit the IJ to consider his request for deferral of deportation under the United Nations Convention Against Torture (CAT)[1] and his claim of ineffective assistance of counsel.    Finding that the BIA acted well within its discretion, we affirm.

## I.

On December 19, 1992, petitioner Canaveral, a citizen of Colombia, legally entered the United States as a nonimmigrant in transit to a ship that was docked in New Orleans, Louisiana.    He never boarded the ship.    Instead, he moved to Boston and, after obtaining a fraudulent social security card, started working for a shoe manufacturing company.

---

[1] The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, was implemented in the United States by the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681-761 (codified at 8 U.S.C. § 1231 (2000)).

In 1995, Canaveral gave a non-lawyer known as "Tony"[2] nine hundred dollars to prepare an asylum application, which was presented to the INS in 1997. "Tony" disappeared soon after he completed Canaveral's application, forcing Canaveral to retract that application and to inform the asylum officer that "Tony" filled out the forms without his participation or consent. Canaveral prepared a second application and presented that to the INS.

The Immigration and Naturalization Service (INS)[3] issued a notice to appear on January 21, 1998, charging Canaveral as an alien lawfully admitted to the United States who failed to maintain the nonimmigrant status that he had when admitted in violation of section 237(a)(1)(C)(i) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1227(a)(1)(C)(i). Conceding removability at his hearing on January 28, 1999, Canaveral sought asylum and withholding of removal pursuant to INA sections 208 and 243(b)(3)(A).

Canaveral testified before the IJ that he was afraid to return to Colombia because he feared persecution by governmental

---

[2]The record suggests that Tony portrayed himself as a lawyer even though he apparently was not one.

[3]In March 2003, the relevant functions of the INS were transferred into the Department of Homeland Security and reorganized as the Bureau of Immigration and Customs Enforcement ("BICE"). For simplicity we refer to the agency throughout this opinion as the INS.

and non-governmental entities for his earlier political activities, some of which were conducted in secret with the non-violent wing of the Revolutionary Armed Forces of Colombia (FARC) when he was a college student. Although his connection to FARC was secret, he organized rallies and student strikes, and went door-to-door in favor of education, economic, and health policy reform in his home city of Itagüi between 1984 and 1992. He said that he received anonymous death threats in response to his organizing efforts, and that a partner in one of his early protests disappeared and was later found murdered. Canaveral testified that the police beat him in 1984 and in 1988 or 1989 after they stopped him and found FARC literature in his possession. In the latter case, the police beat him so severely that they knocked out his two front teeth and fractured his ribs and femur. The police held him for two days, accused him of being responsible for a bomb that had detonated in the middle of town, threatened him with death, and then released him outside of the city limits.

In the late 1980s, having decided that FARC had become too violent, Canaveral took a job overseeing construction projects for the city of Itagüi to allow him to stop his organizing work with FARC. He authored a report in October 1992 documenting massive corruption in the construction bidding process and, rebuffing attempts to bribe him by contractors and other city officials, he presented that report to the members of the city

council.  One month later, a man on a motorcycle opened fire on him and a friend, wounding both.  Canaveral went into hiding after that attempt on his life, staying with a local priest and then with his mother.  With the priest's help, Canaveral was able to procure a transit and a crewman's visa from the American Consulate in Bogota on December 11, 1992 even though he did not work on a ship.  The local police department provided him with protection for approximately seventy-eight hours while he obtained the visa.

After considering Canaveral's testimony and a significant amount of country-specific evidence about Colombia, the IJ denied Canaveral's asylum claim.  Explaining that Canaveral did not provide any specifics regarding his alleged involvement with FARC and that his testimony demonstrated that Canaveral was able to carry out his daily activities with little or no interference from private or governmental entities, the IJ concluded that Canaveral failed to establish past persecution or a well-founded fear of future persecution.[4]  The IJ noted that Canaveral never identified

---

[4]"An asylum applicant bears the burden of establishing that he or she meets the statutory definition of a refugee and is therefore eligible for asylum. 8 C.F.R. § 208.13(a).  Applicants may meet this burden in one of two ways. First, an applicant qualifies as a refugee if he or she demonstrates a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b).  Alternatively, the applicant is entitled to a presumption of a well-founded fear of persecution if he or she establishes past persecution on account of one of the five statutory grounds." Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004).

himself as a FARC member to anyone outside the organization and that there was no evidence suggesting that the Colombian government thought that he was associated with the organization. In fact, the lack of any documented follow-up by government officials after the alleged beating in 1988 or 1989 and the police protection that Canaveral received in 1992 suggested that the government did not consider him a threat. The IJ characterized the gunfire incident as a random act of violence lacking any demonstrable connection with FARC or the government, and concluded that any threats that Canaveral may have received before his departure were designed to hide the corruption that Canaveral was attempting to uncover. Moreover, the acts of violence that allegedly occurred in 1984, 1988 (or 1989) and 1992 were separated by a significant amount of time and did not appear to be part of an organized persecution. Finally, the IJ noted that Canaveral was able to leave Colombia without incident and that there is no indication that individuals associated with FARC or the government have made regular visits to Canaveral's family home seeking his whereabouts. Accordingly, the IJ concluded that "[t]here is no evidence that would clearly lead [the court] to conclude that the government has taken action against [Canaveral]." The IJ denied his asylum application and ordered him deported to Colombia.

The IJ expressed concerns about Canaveral's credibility because of the dishonest manner in which he obtained his visa, the

false documents he used to obtain employment in Boston, his failure to prevent the inclusion of false information in his original asylum application, and questions about the honesty of the translator that Canaveral provided for his initial hearing. However, a closer reading of the IJ's decision reveals that he found Canaveral's asylum case deficient apart from any adverse credibility determination.

Canaveral appealed to the BIA, restating the evidence and claiming that he feared persecution from the government for being a former FARC member and from FARC itself for disavowing his membership. The BIA affirmed the IJ's decision without comment on December 20, 2002. Canaveral did not file a direct appeal of the BIA's decision.

Canaveral's attorney passed away after he filed the appeal to the BIA; Canaveral retained new counsel and filed a motion captioned "Motion to Reopen (Asylum Case)" on January 15, 2003. He sought to reopen his asylum case to obtain relief under the CAT and to address attorney incompetence (concerning the asylum application prepared by "Tony"), the court's improper consideration of this disavowed application (which he characterized as "Judicial Arbitrariness"), and the IJ's allegedly erroneous conclusion that he failed to establish a well-founded fear of future persecution which, even if established, could have been ameliorated by relocating to another part of Colombia. Recognizing that

Canaveral's claims regarding his failure to establish future persecution and the related relocation issue should have been raised in a motion for reconsideration, the BIA treated these claims within the framework of such a motion. It considered the other claims within the framework of the motion to reopen.

The BIA rejected the motion to reconsider, affirming its original analysis and stating:

> We are not persuaded by the respondent's contentions that our prior decision was either legally, or factually, erroneous. Just as this Board will not entertain a motion for reconsideration for the sole purpose of entertaining a late appeal, we will not grant a motion for reconsideration for the sole purpose of permitting a belated discussion that should have been made at the time of the original appeal to the Board.

It explicitly rejected Canaveral's allegation that the potential for relocation played a role in the IJ's decision, stating that he "failed to demonstrate what, if any, role 'relocation' played in the Immigration Judge's decision."[5] Concluding that Canaveral failed to demonstrate prejudice from the alleged ineffective assistance of counsel and that he failed to establish a prima facie case under the CAT, the BIA denied his motion to reopen. Canaveral

---

[5]Canaveral raises the same claim regarding relocation on appeal. Once again, he fails to cite any evidence demonstrating that the IJ rejected his asylum claim after concluding that he could be relocated to a different part of Colombia. In fact, relocation only comes into play if the alien successfully establishes a prima facie case for asylum, and the IJ concluded that Canaveral failed to do so. 8 C.F.R. § 208.13(b)(1)(ii), (b)(2).

filed a timely appeal of the BIA's denial of his motion to reconsider and motion to reopen. However, since the issues raised by Canaveral on appeal were addressed by the Board within the framework of the motion to reopen (the only exception being the "relocation" issue which we have already dispatched), we limit our review to the Board's denial of the motion to reopen.

## II.

We review the BIA's denial of a motion to reopen for abuse of discretion.[6] See Betouche v. Ashcroft, 357 F.3d 147, 149-150 (1st Cir. 2004). "An abuse of discretion will be found where the BIA misinterprets the law, or acts either arbitrarily or capriciously." Wang v. Ashcroft, 367 F.3d 25, 27 (1st Cir. 2004). A motion to reopen allows an alien to bring newly-discovered evidence or grounds for relief to the attention of the BIA. Such a motion must state the new facts to be proven or grounds to be alleged. The BIA may only grant a motion to reopen based on new facts if the "evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). It may only grant a motion to reopen to consider a new ground for relief if it appears the alien's right to apply for such relief was not fully explained

---

[6]Canaveral argues in his brief that we should adopt a "fiduciary" standard of review. He fails to support his argument with any citation to pertinent authority and we are unaware of any such authority. We reject his argument without further discussion.

to him or her, that the alien did not have an opportunity to apply for such relief at the earlier hearing, or that the newly-proffered ground for relief is premised on changed circumstances.  Id.

## A.  Convention Against Torture

Canaveral claims that he is entitled to relief under the CAT based on the Colombian government's acquiescence in his likely torture by FARC.  The BIA rejected this proposition in his motion to reopen, concluding that he failed to present a prima facie case that he was eligible for relief under the applicable regulations. See 8 C.F.R. § 1208.16(c); INS v. Abudu, 485 U.S. 94, 104-108 (1988) (relating the prima facie case requirement to the public interest in "bringing litigation to a close as promptly as is consistent with the interest in giving the adversaries a fair opportunity to develop and present their respective cases").  We agree.

To establish a valid claim for relief under the CAT, an applicant must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal."  8 C.F.R. § 1208.16(c)(2).  The term "torture" is defined as:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a

-10-

third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a)(1). The regulations also provide that "[t]orture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture." 8 C.F.R. § 1208.18(a)(2).

Canaveral claims that it is more likely than not that either the Colombian government will torture him or that it will acquiesce in his torture at the hands of FARC. However, as the BIA observed, he failed to substantiate this claim with detailed evidence that he will be tortured in the future or even that he was tortured in the past. His briefs before the BIA and here on appeal consist of general outlines of the legal principles applicable to the CAT. They do not articulate, with any degree of specificity, how those principles apply to Canaveral. As the government aptly observed in its brief: "It is entirely unclear exactly who he believes will torture him, what mistreatment he expects to suffer, or, most importantly, what evidence supports his claim." Given the lack of detail in Canaveral's motion to reopen, we have no difficulty affirming the BIA's decision denying his motion to reopen to consider his CAT claim.

-11-

## B. Ineffective Assistance of Counsel

Canaveral argues that "Tony" provided him with ineffective assistance of counsel by presenting a fraudulent asylum application, depriving him of due process. We normally apply the factors listed in In re Matter of Lozada, 19 I. & N. Dec. 637 (BIA 1988), to such ineffectiveness claims: (1) the motion must be supported by an affidavit detailing the agreement between counsel and client, (2) the counsel must be informed of the allegations and given a chance to respond, and (3) the motion must indicate whether a complaint regarding any violation of counsel's ethical or legal responsibilities has been filed with the relevant disciplinary authorities and if not, why not. "Tony", of course, was not a lawyer subject to the authority of a disciplinary body that could receive complaints about his work. However, we do not have to decide here the applicability of the Lozada factors to cases in which non-lawyers represented aliens.[7] Our precedents clearly hold that, except in the extreme case, an alien must demonstrate prejudice regardless of whether he or she meets the other Lozada factors. See, e.g., Bernal-Vallejo v. INS, 195 F.3d 56, 64 (1st

---

[7]Non-lawyers may represent aliens in immigration proceedings under certain circumstances. 8 C.F.R. § 292.1. However, "Tony" was probably ineligible to represent Canaveral in this situation because he does not appear to have been a law student, 8 C.F.R. § 292.1(a)(2), a reputable individual appearing without remuneration, 8 C.F.R. § 292.1(a)(3), or an accredited representative of a non-profit organization, 8 C.F.R. § 292.1(a)(4), 292.2, during the events in question.

Cir. 1999). Although we theorized in United States v. Loaisiga, 104 F.3d 484, 488 (1st Cir. 1997) that "there may be deportations where a denial of counsel was so flagrant, and the difficulty of proving prejudice so great, as to argue for presuming harm," this is not such an extreme case. The IJ allowed Canaveral to submit a new asylum application to replace the fraudulent one prepared with the "help" of "Tony". Although the IJ alluded to the fraudulent application as one of several factors that impaired Canaveral's credibility, he did not characterize it as decisive on the issue of credibility. More importantly, as already noted, the IJ's determination was based on Canaveral's failure to produce sufficient evidence; this is independent of any adverse credibility determination. In the absence of any showing of prejudice from the alleged ineffectiveness of a sham attorney, we conclude that the BIA properly refused to reopen this case to address the claim of ineffectiveness.[8]

**Affirmed.**

---

[8]In addressing Canaveral's ineffectiveness claim, we have also addressed his related claim of judicial arbitrariness because the IJ allegedly refused to consider any evidence other than the fraudulent asylum application. That characterization of the judge's evaluation of the evidence is patently false.