# United States Court of Appeals
## For the First Circuit

No. 04-1108

JELENA VLADIMIR OREHHOVA; VALDEK OREHHOV;
ANNE OREHHOVA; and ALEKSANDR SERDJUK,

Petitioners,

v.

ALBERTO GONZALES, ATTORNEY GENERAL,[*]

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Lynch, <u>Circuit Judge</u>,
Stahl, <u>Senior Circuit Judge</u>,
and Lipez, <u>Circuit Judge</u>.

<u>Alexander Lumelsky</u> and <u>Lumelsky & Mogilevich, LLP</u> on brief for
petitioners.
<u>Peter D. Keisler</u>, Assistant Attorney General, <u>David V. Bernal</u>,
Assistant Director, and <u>Ernesto H. Molina, Jr.</u>, Senior Litigation
Counsel, Office of Immigration Litigation, on brief for respondent.

July 21, 2005

---

[*]Alberto Gonzales was sworn in as United States Attorney
General on February 3, 2005. We have therefore substituted
Attorney General Gonzales for John Ashcroft as the respondent. <u>See</u>
Fed. R. Civ. P. 25(d)(1); Fed. R. App. P. 43(c)(2).

**LIPEZ, <u>Circuit Judge</u>.**  Petitioners, a Russian Estonian family, seek review of a Board of Immigration Appeals ("BIA") decision denying their motion to reopen removal proceedings because of ineffective assistance of counsel.  Detecting no abuse of discretion in the BIA's decision, we affirm.

## I.

We recount the facts as contained in the administrative record.  <u>See</u> 8 U.S.C. § 1252(b)(4)(A).  Petitioners Jelena Vladimir Orehhova ("Orehhova"), her husband Valdek Orehhov, and their seven-year-old daughter Anne Orehhova entered the United States as non-immigrant visitors from Estonia in March 1999.  Orehhova's sixteen-year-old son from a previous marriage, Petitioner Aleksandr Serdjuk, followed in June 1999.  In September 1999, Petitioners retained an attorney to assist them in obtaining a grant of asylum.  In January 2000, through counsel and with Orehhova as the lead applicant, Petitioners filed asylum applications with the Immigration and Naturalization Service ("INS"), as it was known at the time.[1]

In her asylum application, Orehhova stated that in March 1999 she had been fired from her office job in Estonia, which she had held for ten years, "solely because of [her] nationality."  She explained that "the Estonian government treats [her] as a Russian"

---

[1]In March 2003 the INS was reorganized as the Bureau of Immigration and Customs Enforcement ("BICE") and its relevant functions transferred to the Department of Homeland Security.

because her parents moved from Russia to Estonia after 1940. Orehhova stated that "[a]s the economy grew worse and worse, more and more 'Russians' were forced out of their jobs and replaced by native Estonians." She also stated that her husband had been fired from his job at a railroad station and her son was prevented from attending a local music school. The reason for these incidents, according to the box checked off on the application, was "Nationality."

In March 2000, Petitioners' asylum applications were denied, and the INS commenced removal proceedings against them on the ground that Petitioners were nonimmigrants who had remained in the United States beyond the time permitted. 8 U.S.C. § 1227(a)(1)(B). Petitioners conceded removability but sought relief in the form of asylum, withholding of removal, and in the alternative, voluntary departure.

Each of the petitioners (except Anne Orehhova), with the assistance of counsel, testified before an immigration judge ("IJ") in support of their asylum applications by describing their reasons for fearing persecution because of their Russian heritage if they returned to Estonia. Petitioners also introduced recent country reports prepared by the U.S. State Department documenting conditions in Estonia during 1998 and 1999. Orehhova testified that in 1988, after her first husband died, she moved from Russia to Estonia where her mother and sister live, and that she was able

to find a job working at the mayor's office because she had several years of job experience. She worked in the same office for different mayors for nearly ten years, from June 1989 through February 1999. Toward the end of her tenure, however, high proficiency in the Estonian language (instead of Russian) became a requirement for many jobs, and Orehhova, who speaks primarily Russian, began to experience harassment at her job. In 1998 she began inquiring about other available jobs, but found none. On February 28, 1999, Orehhova was fired from her job because of her Russian ethnicity, and she and her husband and daughter immediately departed the country, leaving their apartment, which Orehhova still owns, behind.

Orehhova's husband, Valdek Orehhov, testified that he had experienced job discrimination because of anti-Russian sentiment, even though he is Estonian, and corroborated his wife's testimony about her fears of harm at her workplace. Orehhova's son, Aleksandr Serdjuk, testified that he had not been permitted to attend a music school in his hometown because of his Russian heritage and that he had to go to a larger city, Tallinn, in order to attend music school. Serdjuk testified that in Tallinn he had been physically assaulted twice by Estonians who disparaged him for being Russian. He also testified that an apartment he rented with another Russian Estonian had been set on fire. Serdjuk stated that

he had stayed in Estonia until June 1999 in order to complete the academic year at his school.

On September 18, 2000, the IJ denied Petitioners' applications for asylum and withholding of removal, but granted voluntary departure for each of the petitioners except Serdjuk, who had been present in the United States for less than a year before the commencement of removal proceedings.  See 8 U.S.C. § 1229c(b). The IJ found that Orehhova, her husband, and her son had "testified truthfully," and that all three had "suffered forms of harassment, discrimination, [and] recrimination on account of their ethnicity." However, the IJ concluded that "the degree of harm to which they were exposed prior to their [most recent] trip to the United States and that which they have established will be threatened if they return at this time does not []rise to the level required for [a] finding of persecution."[2]  Petitioners appealed the IJ's decision

---

[2]As we explained in Mihaylov v. Ashcroft, 379 F.3d 15, 21 (1st Cir. 2004):

> An asylum applicant bears the burden of establishing that he or she meets the statutory definition of a refugee and is therefore eligible for asylum. 8 C.F.R. § 208.13(a). Applicants may meet this burden in one of two ways. First, an applicant qualifies as a refugee if he or she demonstrates a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(b). Alternatively, the applicant is entitled to a presumption of a well-founded fear of persecution if he or she establishes

to the BIA, which summarily affirmed the decision on February 13, 2003. The BIA permitted Petitioners, including Serdjuk, an additional 30-day period within which to undertake voluntary departure.

Petitioners neither departed the country nor filed a petition for review of the BIA's decision within 30 days. See 8 U.S.C. § 1252(b)(1) ("The petition for review must be filed not later than 30 days after the date of the final order of removal."). However, on May 13, 2003, through new counsel, they filed a timely motion to reopen before the BIA, see 8 CFR 1003.2(c)(2) (permitting motion to reopen within 90 days of final administrative decision), in which they alleged both that their former counsel had provided ineffective assistance amounting to a violation of their Fifth Amendment right to due process, and that changed country conditions in Estonia warranted reopening of their asylum case. On December 23, 2003, the BIA denied the motion to reopen on both grounds.

In its decision, the BIA first found that Petitioners had "met the technical requirements" for raising a claim of ineffective assistance of counsel before the BIA as set forth in Matter of

<hr>

past persecution on account of one of the five statutory grounds.

(citation omitted). "In order to present a viable asylum claim, the applicant must demonstrate both an objectively reasonable and a subjective fear of persecution." Wang v. Ashcroft, 367 F.3d 25, 28 (1st Cir. 2004) (emphasis omitted).

-6-

<u>Lozada</u>, 19 I. & N. Dec. 637, 639 (BIA 1988). Such a claim must be supported

> by 1) an affidavit setting forth "in detail the agreement that was entered into with former counsel with respect to the actions to be taken," as well as any representations made by counsel to the alien; 2) proof that the movant has informed former counsel of the allegations in writing, as well as any response received; and 3) a statement detailing "whether a complaint has been filed with appropriate disciplinary authorities regarding such representation, and if not, why not."

<u>Saakian</u> v. <u>INS</u>, 252 F.3d 21, 25 (1st Cir. 2001) (quoting <u>Matter of Lozada</u>, 19 I. & N. Dec. at 639). Based on the administrative record and the supplemental <u>Lozada</u> materials, however, the BIA concluded that

> we cannot find from the record that [Petitioners'] former counsel's actions were unreasonable. <u>See</u> former counsel's statement regarding motion. It appears that the former counsel represented [Petitioners] in a diligent manner. Furthermore, [Petitioners] have failed to demonstrate prejudice. The record reveals that the acts suffered by the lead [applicant] constitute discrimination and do not rise to the level of persecution.

(citation omitted). The BIA also found that the documents proffered by Petitioners in their motion to reopen in support of their claim of changed country conditions did not justify reopening "on the basis of 'circumstances that have arisen subsequent to the hearing.' 8 C.F.R. § 1003.2(c)(1)." Petitioners timely filed a petition for review of that portion of the BIA's decision denying

their motion to reopen on the ground of ineffective assistance of counsel.

## II.

We review a BIA decision to deny a motion to reopen only for abuse of discretion. Maindrond v. Ashcroft, 385 F.3d 98, 100 (1st Cir. 2004). "An abuse of discretion will be found where the BIA misinterprets the law, or acts either arbitrarily or capriciously." Wang, 367 F.3d at 27. Within this framework, we review the BIA's legal conclusions de novo, "according due weight to the BIA's expertise in construing the statutory framework that it administers." Radkov v. Ashcroft, 375 F.3d 96, 98 (1st Cir. 2004). Any error of law "comprises an abuse of discretion." Id. Motions to reopen are permitted only where they present "evidence" that is "material and was not available and could not have been discovered or presented at the former hearing." 8 C.F.R. § 1003.2(c)(1). Claims of ineffective assistance of counsel satisfy this requirement. See Saakian, 252 F.3d at 25.

While the Sixth Amendment right to counsel does not apply in deportation proceedings, which are civil rather than criminal, appellate courts have "recognized that there is a due process violation if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." Bernal-Vallejo v. INS, 195 F.3d 56, 63 (1st Cir. 1999); see id. at 63-64 (collecting cases). "It is generally also expected that the alien

-8-

show at least a reasonable probability of prejudice." Saakian, 252 F.3d at 25; see also Toban v. Ashcroft, 385 F.3d 40, 46 (1st Cir. 2004) (alien alleging denial of due process must show prejudice in all but the most "extreme case[s]").

The BIA did not abuse its discretion in concluding that "former counsel represented [Petitioners] in a diligent manner." Even a cursory review of the record reveals that Petitioners had a fair opportunity to present their case for asylum and withholding of removal to the IJ: they provided extensive testimony in response to direct examination by counsel and questioning by the IJ, who then issued a reasoned decision.[3] The most substantial of Petitioners' allegations is that their former attorney's lack of familiarity with the plight of Russians in post-Soviet era Estonia led to his decision to pursue a legal theory that was doomed to failure -- namely, as stated in counsel's affidavit, the theory "that this family could not get any job anywhere in Estonia, so that their treatment was persecution." Instead, Petitioners assert, counsel should have recognized and employed a broader theory of persecution by arguing that government policies consciously

---

[3]While Petitioners assign a host of specific errors to their former counsel's performance, both before and during the hearings, the bulk of these allegations amount to no more than "garden-variety claims that counsel should have handled matters somewhat differently and . . . do not even approach a showing that [Petitioners have] been deprived of a constitutionally adequate opportunity to make [their] case." Hernandez v. Reno, 238 F.3d 50, 56 (1st Cir. 2004) (affirming denial of alien's petition for writ of habeas corpus on ineffectiveness grounds).

designed to "secure an Estonian national identity," including but not limited to the imposition of strict Estonian language requirements for employment, operate to persecute Russian Estonians in order to push them out of Estonia.[4]

Even if Petitioners could somehow establish that former counsel "prevented [them] from reasonably presenting" this slightly recast theory of persecution, Bernal-Vallejo, 195 F.3d at 63, the BIA acted well within its discretion in denying the motion to reopen on the ground that Petitioners suffered no prejudice as a result.[5] The record fails to "compel a reasonable inference that [Petitioners] could prevail" on their alternate theory of persecution. Wang, 367 F.3d at 28. The IJ had before her country reports released by the U.S. Department of State for 1998 and 1999,

---

[4]Other negative effects of Estonian government policies identified by Petitioners include: (1) "political consequences," such as "non-representative governance of ethnic Russian Estonians"; (2) "social consequences," such as "herding and residence restriction" to areas of Estonia bordering Russia; and (3) "intellectual and education consequences," such as "restrictions" on "attainment of certain levels of education for . . . overall well[-]being in every day Estonian life." Petitioners also cite the negative effects of Estonia's "historical background," which they claim sheds light on "[the] Estonian government's major motive [in] enacting such policies," namely, the government's view of decades of "Communist-enforced migration [of Russians into Estonia] as an evil perpetrated on Estonian culture, people, language[,] and above all sovereignty."

[5]Petitioners insist that if their former attorney had adequately advanced their theory of persecution by introducing evidence of the harmful effects of Estonian governmental policies on Russian Estonians, they would have been "almost certain to receive a grant of asylum." Needless to say, such a conclusory statement does not amount to a showing of prejudice.

the most recent of which clearly documented evidence of discrimination against Russian Estonians. Despite this evidence, the IJ found that "the degree of harm" threatened by such discrimination did not amount to persecution.[6] Instead, the IJ stated:

> It appears from the evidence presented by [Petitioners'] own counsel that Estonia is a country which is wrestling with issues of hostility and that these issues continue to exist but that the country is attempting to deal with this and attempting to promote and strengthen a western type of democracy. [Petitioners] do not appear to have been willing to remain in Estonia, not because their life or freedom was threatened, but because they were facing difficulties economically which were imposed on account of the[ir] nationality or ethnicity.

The BIA supportably concluded that the argument and evidence proffered by Petitioners in their motion to reopen failed to establish a "reasonable probability of prejudice," Saakian, 252 F.3d at 25. Accordingly, we detect no abuse of discretion in the BIA's decision to deny Petitioners' motion to reopen.

As a final matter, Petitioners ask us to consider evidence that was not available at the time they filed their motion to reopen with the BIA on May 13, 2003, namely, an August 8, 2003 decision of the Massachusetts Supreme Judicial Court

---

[6]"Discrimination is not the equivalent of persecution; '[t]o qualify as persecution, a person's experience must rise above unpleasantness, harassment, and even basic suffering.'" Pieterson v. Ashcroft, 364 F.3d 38, 44 (1st Cir. 2004) (citations omitted) (alteration in original).

-11-

("SJC") disciplining their former attorney for making intentionally deceptive statements in his application for admission to the bar. See In re Moore, SJC-BD-2003-034, available at http://www.mass.gov/obcbbo/bd03-034.htm (Mass. August 8, 2003) (decision of single justice ordering disbarment), amended by In re Moore, 812 N.E.2d 1197 (Mass. 2004) (ordering two-year suspension from practice of law instead of disbarment). Pursuant to 8 U.S.C. § 1252(b)(4)(A), a court of appeals must "decide the petition only on the administrative record on which the order of removal is based." We note that the BIA did not decide Petitioners' motion to reopen until December 23, 2003, several months after the SJC rendered its decision. Petitioners did not attempt to bring the SJC's decision to the BIA's attention by seeking to supplement the record before the BIA while their motion to reopen was pending or by asking the BIA to reopen the motion sua sponte after it rendered a decision. See 8 C.F.R. § 1003.2(a) ("The Board may at any time reopen or reconsider on its own motion any case in which it has rendered a decision.").

The petition for review is **denied**. Because we lack the authority to grant Petitioners' alternative claim for relief in the form of reinstatement of voluntary departure, see Bocova v. Gonzales, No. 04-2175, 2005 U.S. App. LEXIS 12421, *20-21 (1st Cir. June 24, 2005), Petitioners' claim for such relief is **dismissed**. The request for oral argument is **denied**.

-12-

**So ordered**.